Lee A. Weiss (admitted *pro hac vice*)
lweiss@dreierllp.com
Rebecca Tingey (admitted *pro hac vice*)
rtingey@dreierllp.com
**DREIER LLP**
499 Park Avenue
New York, NY 10022
Phone: (212) 328-6100
Fax: (212) 328-6101

Paul R. Kiesel (SBN 119854)               David M. Arbogast (SBN 167571)
kiesel@kbla.com                           darbogast@law111.com
Patrick DeBlase (SBN 167138)              Jeffrey K. Berns (SBN 131351)
deblase@kbla.com                          jberns@law111.com
Michael C. Eyerly (SBN 178693)            **ARBOGAST & BERNS LLP**
eyerly@kbla.com                           19510 Ventura Boulevard, Suite 200
**KIESEL BOUCHER LARSON LLP**             Tarzana, CA 91356
8648 Wilshire Blvd.                       Phone: (818) 961-2000
Beverly Hills, CA 90211                   Fax: (818) 867-4820
Phone: (310) 854-4444
Fax: (310) 854-0812

Attorneys for Plaintiff and all others similarly situated

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION

| | |
|---|---|
| MARJORIE BROOKS, individually and on behalf of all others similarly situated, | ) **CASE NO. C-O7-04501-JF** ) ) |
| Plaintiff, | ) ) **NOTICE OF MOTION AND MOTION** |
| v. | ) **FOR LEAVE TO FILE SECOND** ) **AMENDED COMPLAINT** |
| COMUNITY LENDING, INC. and DOES 1 through 10 inclusive, | ) ) |
| Defendants. | ) **Hearing Date: October 3, 2008** ) **Hearing Time: 9:00 a.m.** ) **Courtroom:    Courtroom 3, 5th Floor** ) ) ) ) ) |

DREIER LLP
499 PARK AVENUE
NEW YORK, NY
10022

NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT
C-07-04501-JF

**TO THE CLERK OF THE COURT AND TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on October 3, 2008 at 9:00 a.m. or as soon thereafter as the matter may be heard, pursuant to Rules 15(a) and 21 of the Federal Rules of Civil Procedure, Plaintiff Marjorie Brooks ("Plaintiff"), by and through her attorneys, will and hereby does move this Court for an Order granting her leave to amend her class action complaint to: (a) substitute (i) Greenwich Capital Financial Products, Inc. ("Greenwich"), a purchaser of Plaintiff's Option Adjustable Rate Mortgage ("Option ARM") loan, (ii) GMAC Mortgage, LLC ("GMAC"), the current servicer of Plaintiff's Option ARM loan, and (iii) Wells Fargo Bank, N.A. ("Wells Fargo"), the current owner of Plaintiff's Option ARM loan for Does 1-3, respectively, as defendants in this action; and (b) refine the allegations of the Complaint. A copy of the proposed Second Amended Class Action Complaint is attached as Exhibit A hereto.

On August 30, 2007, Plaintiff filed her class action complaint naming ComUnity Lending, Inc. ("ComUnity") and Does 1-10 inclusive as defendants. Plaintiff filed an amended class action complaint on October 11, 2007 to refine the allegations in the complaint. On January 4, 2008, ComUnity filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California. Accordingly, Plaintiff's action against ComUnity is automatically stayed.

Paragraph 10 of the amended complaint provides as follows:

The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 10, inclusive, and each of them, are unknown to Plaintiff at this time, and Plaintiff therefore sues said Defendants by such fictitious names. Plaintiff alleges, on information and belief, that each Doe defendant is responsible for the actions herein alleged. Plaintiff will seek leave of Court to amend this Complaint when the names of said Doe defendants have been ascertained.

Pursuant to documents provided to Plaintiff recently by ComUnity, upon information and belief, Greenwich purchased from ComUnity Plaintiff's Option ARM loan that is the subject of this action. In addition, upon information and belief, GMAC is the current servicer of Plaintiff's Option ARM

NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT
C-07-04501-JF

loan.  Finally, GMAC has informed Plaintiff's counsel that Wells Fargo is the current owner of Plaintiff's Option ARM loan.  Thus, Plaintiff respectfully requests leave to substitute Greenwich, GMAC and Wells Fargo for Does 1-3, respectively, as defendants in this litigation.    If the motion is granted, Plaintiff will promptly file the second amended complaint and cause it to be served upon Greenwich, GMAC and Wells Fargo.

Leave to amend a pleading is generally "freely granted" and should be granted "when justice so requires."  *See* Fed. R. Civ. P. 15(a).  *See also Solis v. Regis Corp.*, No. 05-03039, 2007 WL 1449801, at *1 (N.D. Cal. May 15, 2007).  In determining whether to grant leave to amend, the court should ensure that the amendment does not prejudice the opposing party, is not sought in bad faith, does not cause undue delay and is not an exercise in futility.  *Id*.

Here, there is no prejudice to the opposing party or danger of undue delay as ComUnity has yet to appear in this action and the action against ComUnity has been stayed as a result of its bankruptcy petition.  Plaintiff seeks leave to amend in good faith and in light of the above-referenced developments since she filed her amended complaint.  In a similar case pending in the Central District of California, Judge Andrew Guilford granted plaintiff's motion for leave to amend the complaint, finding no undue prejudice to the opposing party, and no evidence of bad faith (Order attached as Exhibit B hereto).  Finally, as this Court and other courts have issued rulings on motions to dismiss in similar cases involving Option ARM loans since the amended complaint was filed, the proposed second amended complaint refines the allegations in the first amended complaint.

Accordingly, based on the foregoing, Plaintiff respectfully requests that the Court grant her motion for leave to file a second amended complaint.  In addition, Plaintiff respectfully requests that the Court waive the requirement of a memorandum of points and authorities in Local Rule 7-4.  Finally, as ComUnity has yet to appear in the action, Plaintiff's counsel is unable to confer with opposing counsel regarding the proposed hearing date, pursuant to the San Jose Division Standing Order Regarding Case Management in Civil Cases.

Dreier LLP
499 Park Avenue
New York, NY
10022

- 2 -
NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT
C-07-04501-JF

DATED:   August 11, 2008

**DREIER LLP**

By:  /s/ Lee A. Weiss
Lee A. Weiss (admitted *pro hac vice*)
lweiss@dreierllp.com
Rebecca Tingey (admitted *pro hac vice*)
rtingey@dreierllp.com
499 Park Avenue
New York, NY 10022
Phone: (212) 328-6100
Fax: (212) 328-6101

**ARBOGAST & BERNS LLP**
Jeffrey K. Berns (SBN 131351)
jberns@law111.com
David M. Arbogast (SBN 167571)
darbogast@law111.com
19510 Ventura Boulevard, Suite 200
Tarzana, CA 91356
Phone: (818) 961-2000
Fax: (818) 867-4820

**KIESEL BOUCHER LARSON LLP**
Paul R. Kiesel (SBN 119854)
kiesel@kbla.com
Patrick DeBlase (SBN 167138)
deblase@kbla.com
Michael C. Eyerly (SBN 178693)
eyerly@kbla.com
8648 Wilshire Blvd.
Beverly Hills, CA 90211
Phone: (310) 854-4444
Fax: (310) 854-0812

*Attorneys for Plaintiff*

NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT
C-07-04501-JF

1

**CERTIFICATE OF SERVICE**

2

3      The undersigned hereby certifies that ComUnity Lending, Inc., currently the sole defendant

4  in this litigation, filed for bankruptcy prior to when it was required to respond to the operative

5  complaint in this action.  Thus, it has never appeared in this action, such that Plaintiff's counsel is

6  unable to serve the foregoing Notice of Motion and Motion for Leave to File Second Amended

7  Complaint on ComUnity Lending, Inc.

8

9                                             /s/ Rebecca Tingey
                                              Rebecca Tingey
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 4 -
NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT
C-07-04501-JF

# EXHIBIT A

Lee A. Weiss (admitted *pro hac vice*)
lweiss@dreierllp.com
Rebecca Tingey (admitted *pro hac vice*)
rtingey@dreierllp.com
**DREIER LLP**
499 Park Avenue
New York, NY 10022
Phone: (212) 328-6100
Fax: (212) 328-6101

Paul R. Kiesel (SBN 119854)
kiesel@kbla.com
Patrick DeBlase (SBN 167138)
deblase@kbla.com
Michael C. Eyerly (SBN 178693)
eyerly@kbla.com
**KIESEL BOUCHER LARSON LLP**
8648 Wilshire Blvd.
Beverly Hills, CA 90211
Phone: (310) 854-4444
Fax: (310) 854-0812

David M. Arbogast (SBN 167571)
darbogast@law111.com
Jeffrey K. Berns (SBN 131351)
jberns@law111.com
**ARBOGAST & BERNS LLP**
19510 Ventura Boulevard, Suite 200
Tarzana, CA 91356
Phone: (818) 961-2000
Fax: (818) 867-4820

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| MARJORIE BROOKS, individually and on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COMUNITY LENDING, INC., GREENWICH CAPITAL FINANCIAL PRODUCTS, INC., GMAC MORTGAGE, LLC, WELLS FARGO BANK, N.A. and DOES 4 through 10, inclusive,<br><br>Defendants. | Case No. C-07-04501-JF<br><br>**[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT FOR**:<br><br>**(1)** **Violations of the Truth in Lending Act, 15 U.S.C. § 1601,** *et seq.***;**<br>**(2)** **Violation of Bus. & Prof. Code § 17200,** *et seq.* **- "Unlawful" Business Practices (TILA);**<br>**(3)** **Fraudulent Omissions;**<br>**(4)** **Violation of Bus. & Prof. Code § 17200,** *et seq.* **– "Unfair" and "Fraudulent" Business Practices;**<br>**(5)** **Breach of Contract; and**<br>**(6)** **Tortious Breach of the Covenant of Good Faith and Fair Dealing.**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Marjorie Brooks, on behalf of herself and all others similarly situated alleges as follows:

## I.    INTRODUCTION

1.      This is an action pursuant to the Truth in Lending Act ("TILA"), 15 U.SC. § 1601, *et seq.*; California's Unfair Competition Law, Bus. & Prof. Code § 17200, *et seq.* ("UCL"); and other statutory and common law in effect.  Plaintiff bring this action against Defendants ComUnity Lending, Inc., Greenwich Capital Financial Products, Inc. (formerly named as Doe No. 1), GMAC Mortgage, LLC (formerly named as Doe No. 2), Wells Fargo Bank, N.A. (formerly named as Doe No. 3) and Does 4 through 10 (collectively "Defendants"), based, in part, on Defendants' failure to clearly and conspicuously disclose to Plaintiff and Class members, in Defendants' Option Adjustable Rate Mortgage ("Option ARM") loan documents, and in the required disclosure statements accompanying the loans, (i) the actual interest rate on the loans, as required by 12 C.F.R. § 226.18; (ii) that payments on the loans made according to the payment schedule provided by Defendants will result in negative amortization and that the principal balance on the loans would therefore increase, as required by 12 C.F.R. § 226.19; and (iii) that the initial interest rate provided was discounted and did not reflect the actual interest that Plaintiff and Class members would be paying on the loans, as required by 12 C.F.R. § 226.19.

2.      By this action, Plaintiff seeks to obtain for herself and for a Class of similarly situated persons the remedies afforded to them by TILA and other laws.

## II.    THE PARTIES

3.      Plaintiff Marjorie Brooks, is, and at all times relevant to this Complaint was, a resident of Moreno Valley, California.  On or about May 19, 2006, Plaintiff refinanced her existing home loan and entered into an Option ARM loan agreement with Defendant ComUnity Lending, Inc.  The Option ARM loan was secured by Plaintiff's primary residence.  Attached hereto as Exhibit 1 is a true and correct copy of the Note and Truth in Lending Disclosure Statement ("TILDS") pertinent to this action.

4.    Defendant ComUnity Lending, Inc. ("ComUnity")[1] is a California corporation doing business in California at all relevant times.  At all relevant times hereto, ComUnity was and is engaged in the business of distributing and selling the Option ARM loans that are the subject of this Complaint, including in Santa Clara County, California.  ComUnity transacts business in Santa Clara County, California and at all relevant times distributed and sold Option ARM loans throughout the United States, including in Santa Clara County, California.  ComUnity has significant contacts with Santa Clara County, California and the activities complained of herein occurred, in whole or in part, in Santa Clara County, California.

5.    Defendant Greenwich Capital Financial Products, Inc. ("Greenwich") is a Delaware corporation doing business in California at all relevant times.  At all relevant times hereto, Greenwich was and is engaged in the business of purchasing the Option ARM loans that are the subject of this Complaint, including in Santa Clara County.  Greenwich owned the Option ARM loans that are the subject of this Complaint after it purchased them from ComUnity.  Greenwich transacts business in Santa Clara County, California and at all relevant times purchased Option ARM loans throughout the United States, including Santa Clara County, California.  Greenwich has significant contacts with Santa Clara County, California, and the activities complained of herein occurred, in whole or in part, in Santa Clara County, California.

6.    Defendant GMAC Mortgage, LLC ("GMAC") is a Delaware corporation doing business in California at all relevant times.  At all relevant times hereto, GMAC was and is engaged in the business of servicing the Option ARM loans that are the subject of this Complaint.  GMAC transacts business in Santa Clara County, California and at all relevant times serviced Option ARM loans throughout the United States, including in Santa Clara County, California.  GMAC has significant contacts with Santa Clara County, California, and the activities complained of herein occurred, in whole or in part, in Santa Clara County, California.

---

[1] ComUnity filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Northern District of California on January 4, 2008.  As ComUnity remains in bankruptcy, Plaintiff's action against ComUnity is currently stayed.

7.    Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a Delaware corporation doing business in California at all relevant times.  Upon information and belief, some of the loans that are the subject of this Complaint, including Plaintiff's loan, or rights associated therewith were sold, transferred or assigned to Wells Fargo.  At all relevant times hereto, Wells Fargo was and is engaged in the business of owning the Option ARM loans that are the subject of this Complaint. Wells Fargo transacts business in Santa Clara County, California and at all relevant times owned Option ARM loans throughout the United States, including in Santa Clara County, California. Wells Fargo has significant contacts with Santa Clara County, California, and the activities complained of herein occurred, in whole or in part, in Santa Clara County, California.

8.    At all times mentioned herein, Defendants, and each of them, were engaged in the business of distributing, selling, purchasing, owning and/or servicing the Option ARM loans that are the subject of this Complaint.

9.    Plaintiff is informed, believes, and thereon alleges, that each and all of the aforementioned Defendants are responsible in some manner, either by act or omission, strict liability, fraud, deceit, fraudulent concealment, negligence, respondeat superior, breach of contract or otherwise, for the occurrences herein alleged, and that Plaintiff's injuries, as herein alleged, were proximately caused by the conduct of Defendants.

10.    Plaintiff is informed, believes, and thereon alleges, that at all times material hereto and mentioned herein, each of the Defendants (both named and Doe defendants) sued herein were the agent, servant, employer, joint venturer, partner, division, owner, subsidiary, alias, assignee and/or alter-ego of each of the remaining Defendants and were at all times acting within the purpose and scope of such agency, servitude, joint venture, division, ownership, subsidiary, alias, assignment, alter-ego, partnership or employment and with the authority, consent, approval and ratification of each remaining Defendants.

11.    At all times herein mentioned, each Defendant was the co-conspirator, agent, servant, employee, assignee and/or joint venturer of each of the other Defendants and was acting within the course and scope of said conspiracy, agency, employment, assignment and/or joint venture and with the permission and consent of each of the other Defendants.

12.     Plaintiff is informed, believes, and thereon alleges, that Defendants and each of them, at all material times relevant to this Complaint, performed the acts alleged herein and/or otherwise conducted business in California.  Defendants, and each of them, are corporations or other business entities, form unknown, have, and are doing business in this judicial district.

13.     Plaintiff is informed, believes, and thereon alleges, that Does 4 through 10, inclusive, are securitized trusts, equity funds, collateralized debt obligations (CDO), CDO underwriters, CDO trustees, hedge funds or other entities that acted as additional lenders, loan originators and/or are assignees to the loans which are the subject of this action.  Plaintiff alleges, on information and belief, that each Doe Defendant is responsible for the actions herein alleged.  The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants Does 4 through 10, inclusive, and each of them, are unknown to Plaintiff at this time, and Plaintiff therefore sues said Defendants by such fictitious names.  Plaintiff will seek leave of Court to replace the fictitious names of these entities with their true names when they are discovered.

14.     Plaintiff is informed, believes, and thereon alleges, that at all times relevant during the liability period, Defendants, and each of them, including without limitation those Defendants herein sued as Does, were acting in concert or participation with each other, or were joint participants and collaborators in the acts complained of, and were the agents or employees of the others in doing the acts complained of herein, each and all of them acting within the course and scope of said agency and/or employment by the others, each and all of them acting in concert one with the other and all together.

### III.     JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1601, *et seq.* and 28 U.S.C. § 1331.

16.     This Court has personal jurisdiction over the parties in this action by the fact that Defendants reside in this District or are licensed to do and do business in California.

17.     Venue is proper within this District and Division pursuant to 28 U.S.C. §1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this

District and because there is personal jurisdiction in this district over the named Defendants because they regularly conduct business in this judicial district.

## IV. FACTS COMMON TO ALL CAUSES OF ACTION

18.     The instant action arises out of residential mortgage loan transactions in which Defendants failed to disclose pertinent information in a clear and conspicuous manner to Plaintiff and Class members, in writing, as required by law.

19.     This action also concerns Defendants' unlawful, fraudulent and unfair business acts or practices. Defendants engaged in a campaign of deceptive conduct and concealment aimed at maximizing the number of consumers who would accept Option ARM loans in order to maximize Defendants' profits, even as Defendants knew their conduct would cause many of these consumers to lose their homes through foreclosure.

20.     Plaintiff, along with thousands of other similarly situated consumers, was sold an Option ARM home loan by Defendants. The Option ARM loan sold to Plaintiff and Class members is a deceptively devised financial product. The loan has a variable rate feature with payment caps. The product was sold based on the promise of a low fixed payment resulting from a prominently featured low interest rate. In fact, Plaintiff and Class members were charged a different, much greater interest rate than promised. Further, Defendants disguised from Plaintiff and Class members that Defendants' Option ARM loan was designed to, and did, cause negative amortization to occur. Further still, once lured into these loans, consumers could not easily extricate themselves from the loans because Defendants included in the loans a stiff and onerous prepayment penalty making it extremely difficult, if not impossible, for borrowers to pay off the loans.

21.     The methods used by Defendants to sell the Option ARM loans to Plaintiff and Class members violate TILA. TILA is supposed to protect consumers; it mandates certain disclosures be made by lenders to borrowers concerning the terms and conditions of their home loans. Defendants failed to make these disclosures in connection with the Option ARM loans sold to Plaintiff and the Class.

22.     At all relevant times, Defendants sold their Option ARM loan to consumers, including Plaintiff, in a false or deceptive manner. Defendants represented to the general public that

their Option ARM loan would provide a very low, fixed interest rate for a period of three to five years and no negative amortization. Defendants used this "teaser" rate to lure Plaintiff into purchasing Defendants' Option ARM loan. However, the low fixed rate was illusory -- a false promise. Plaintiff and others similarly situated did not receive the benefit of the low rate promised to them. Once signed on to Defendants' loan, the interest rate applied to Plaintiff's and Class members' loans was immediately and significantly increased.

23.     Plaintiff and others similarly situated were consumers who applied for a mortgage loan through Defendants. During the loan application process, in each case, Defendants represented to Plaintiff and Class members that in accepting these loan terms, they would be able to lower their mortgage payments and save money. Defendants initiated this scheme in order to maximize the amount of loans it sold to consumers and to maximize their profits.

24.     Based on Defendants' representations, and the misconduct alleged herein, Plaintiff and Class members agreed to finance their primary residences through Defendants' Option ARM loan. Plaintiff and Class members were told they were being sold a home loan with a low interest rate of between 1% and 3% (the "teaser" rate), and that the interest rate was fixed for the first three to five years of the loan. Defendants also informed Plaintiff, and Plaintiff was led to believe, that if she made payments based on the promised low interest rate, which were the payments reflected in the written payment schedule provided to her by Defendants, that the loan was a no negative amortization home loan. Plaintiff's payments were to be applied to her principal loan balance as well as interest.

25.     After the purported three to five year fixed interest period, Plaintiff and Class members reasonably believed, based on the representations contained in the documents Defendants provided to Plaintiff and Class members, that they would be able to refinance their loans and obtain a new loan before their scheduled payments increased. However, the payment schedule provided by Defendants failed to disclose to, and by omission failed to inform these consumers that due to the negative amortization that was purposefully built into these loans, Plaintiff and Class members would be unable to refinance their loans as there would be little or no equity left to refinance, and

indeed, the principal balance owed on the loan would be more than Plaintiff had originally borrowed.

26.    Plaintiff believed these facts to be true because that is what the Defendants wanted consumers to believe.  Defendants aggressively positioned their product as a fixed, low interest home loan.  Defendants knew that if it was positioned in such a manner, their Option ARM loan would be a hugely popular and profitable product for them.  Defendants also knew, however, that they were selling the product in a false and deceptive manner.  While Defendants trumpeted the low interest rate loans to the public, Defendants knew their promise of a low interest rate was illusory.

27.    In fact, Defendants' Option ARM loan possessed a low, fixed *payment* but not a low, fixed interest rate.  Unbeknownst to Plaintiff and Class members, the actual interest rate they were charged on their loans was not fixed, was not the low teaser interest rate stated in the loan documentation, and was in fact considerably higher than going market rates.  And after purchasing Defendants' Option ARM loan product, Plaintiff and Class members did not actually receive the benefit of the low teaser rate at all in some cases, or at best, they received that rate for only a single month.  Immediately thereafter, Defendants in every instance and for every loan, increased the interest rate they charged to consumers.  The now-increased interest charges incurred by Plaintiff and Class members over and above the fixed interest payment rate were added to the principal balance on their home loans in ever increasing increments, substantially reducing the equity in these borrowers' homes.

28.    In stark contrast to this reality, Defendants, through the standardized loan documents they created and supplied to Plaintiff and Class members, stated that negative amortization was only a mere possibility.  Defendants concealed and failed to disclose to Plaintiff and the Class the fact that the loan, as presented and designed, in fact, guaranteed negative amortization.  Defendants failed to disclose and omitted the objectively material fact that negative amortization was absolutely certain to occur if consumers followed the payment schedule listed by Defendants in the TILDS.  This information was objectively material and necessary for consumers to make an informed decision because this would have revealed that the loan's principal balance would increase if the payment schedule was followed, thereby rendering it impossible to refinance the loan at or around

the time the prepayment penalty expired and/or by the time the interest and payment rates re-set.   In this respect, Defendants utterly failed to place any warning on the TILDS about negative amortization.

29.    At all relevant times, once Plaintiff and Class members accepted Defendants' Option ARM loan contract, they had no viable option by which to extricate themselves because these Option ARM loan agreements included a draconian pre-payment penalty for a period of up to three years.

30.    The Option ARM loans sold by Defendants all have the following uniform characteristics:

(a)    There is an initial low interest rate or "teaser" rate that was used to entice the borrower into entering into the loan.  The rate offered was typically 1% - 3%;

(b)    The loan has a corresponding low payment schedule.  The documentation provided intended to misleadingly portray to consumers that the low payments for the first several years were a direct result of the low interest rate being offered;

(c)    The initial payments in the required disclosures were precisely the amount that would be required to pay both interest and principal in a fully amortized 30 year loan based upon the low interest rate being offered.  The purpose was to assure that if someone were to calculate what the payment would be at the low offered interest rate, it corresponded to the payment schedule.  This portrayal was intended to further mislead consumers into believing that the payments were enough to cover all principal and interest;

(d)    The payment has a capped annual increase on the payment amount; and

(e)    A substantial number of the loans include a prepayment penalty preventing consumers from securing a new loan for a period of up to three years.

31.    Defendants uniformly failed to disclose to, and by omission, failed to inform consumers, including Plaintiff and Class members, in a clear and conspicuous manner that the "teaser" rate offered by Defendants was actually a discounted rate and only applied to the loans for thirty (30) days.  Thereafter, the true interest charged on the loans was significantly higher than the promised rate.

32.     Defendants uniformly failed to disclose to, and by omission failed to inform, consumers, including Plaintiff and Class members, that the payments set forth in the TILDS were insufficient to cover the actual charges and that this was, in fact, a loan that would cause Plaintiff and Class members to lose the equity they had in their homes.

33.     Defendants uniformly failed to disclose to, and by omission failed to inform, consumers, including Plaintiff and Class members, that when the principal balance increased to a certain level, they would no longer have the option of making the fixed interest payment amount.

34.     Disclosing whether a payment will result in negative amortization is of critical importance to consumers.  If the disclosed payment rate is insufficient to pay both principal and interest, one of the consequences of negative amortization is a loss of equity.  Defendants, and each of them, are, and at all relevant times hereto have been, aware that clear and conspicuous disclosure of the actual interest rate and a payment rate sufficient to avoid negative amortization and the concomitant loss of equity is extremely important, material information.

35.     At all relevant times, Defendants, and each of them, knew or should have known, or were reckless in not knowing, that: (i) the payment rate provided to Plaintiff and Class members was insufficient to pay both interest and principal; (ii) that negative amortization was substantially certain to occur if Plaintiff and Class members made payments according to the payment schedule provided by Defendants; and (iii) that loss of equity and/or loss of Plaintiff's and Class members' residences was substantially certain to occur if Plaintiff and Class members made payments according to the payment schedule provided by Defendants.

36.     In spite of their knowledge, Defendants sold their Option ARM loans as a product that would provide Plaintiff and Class members with a low interest rate for the first three to five years of the loan, and at all relevant times, failed to disclose and/or concealed this information by making partial representations of material facts when Defendants had exclusive knowledge of material facts that negative amortization was certain to occur.  This concealed and omitted information was not known to Plaintiff and Class members.  Because the Option ARM loans did not provide a low interest rate for the first three to five years of the Note and the payment amounts set

forth by Defendants were insufficient to pay both principal and interest, negative amortization occurred.

37.     The true facts about Defendants' Option ARM loans are that they do not provide the low interest rate promised and they are certain to result in negative amortization.

38.     Disclosure of a payment rate that is sufficient to pay both principal and interest on the loans is of critical importance to consumers.  If the disclosed payment rate is insufficient to pay both principal and interest, one of the consequences is that negative amortization or loss of equity will occur.  Defendants, and each of them are, and at all relevant times have been, aware that the ability of the disclosed payment rate to pay both principal and interest so as to avoid negative amortization is one of the most important terms of a loan.

39.     To this day, Defendants continue to conceal material information from consumers and the public that: (i) the payment amounts on the payment schedules provided to Plaintiff and Class members are and were insufficient to pay both principal and interest; (ii) if the disclosed payment schedule is followed, Plaintiff and Class members will suffer negative amortization; and (iii) loss of equity and/or loss of the property is substantially certain to occur if the disclosed payment schedule is followed.  Nevertheless, Defendants have refused to clearly and conspicuously disclose to Plaintiff and Class members the existence of this important material information and the injury caused thereby, including but not limited to the loss of equity.

40.     In the end, the harm caused by Defendants' failures to disclose and omissions, as alleged herein, grossly outweighs any benefit that could be attributed to them.

41.     Knowing the truth and motivated by profit and market share, Defendants knowingly and willfully engaged in the acts and/or omissions to mislead and/or deceive Plaintiff and all others similarly situated.

42.     Defendants' failure of disclosure regarding their Option ARM loans have resulted and will continue to result in significant loss and damage to Plaintiff and Class members, including but not limited to the loss of equity these consumers have or had in their homes.

43.     The facts which Defendants misrepresented and concealed, as alleged in the preceding paragraphs, were material to the decisions about whether to purchase Option ARM loans

in that Plaintiff and Class members would not have purchased these loans but for Defendants' unlawful, unfair, fraudulent and/or deceptive acts and/or practices as alleged herein.

44.    Defendants' unlawful, unfair, fraudulent, untrue and/or deceptive acts and/or practices were committed with willful and wanton disregard for whether or not Plaintiff and Class members would receive a home loan that would actually provide the low interest and payment rate, as promised, for the first three to five years of the loan that would be sufficient to pay both principal and interest.

45.    Upon information and belief, at all relevant times during the liability period, Defendants possessed full knowledge and information concerning the above facts about the Option ARM loans, and nevertheless sold these Option ARM loans throughout the United States, including in the State of California.

## V.    CLASS ACTION ALLEGATIONS

46.    Plaintiff brings this action on behalf of herself, and on behalf of all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), and 23(b), and the case law thereunder. The class Plaintiff seeks to represent is defined as follows:

> All individuals in the United States of America who, within the four year period preceding the filing of Plaintiff's Complaint through the date notice is mailed to the Class, received an Option ARM loan through ComUnity Lending, Inc. on their primary residence located in the United States of America (the "Class"). Excluded from the Class are Defendants' employees, officers, directors, agents, representatives, and their family members.

> An appropriate sub-Class exists for the following Class members: All individuals in the United States of America who, within the three year period preceding the filing of Plaintiff's Complaint through the date notice is mailed to the Class, received an Option ARM loan through ComUnity Lending. on their primary residence located in the

1    United States of America.  Excluded from the sub-Class are

2    Defendants' employees, officers, directors, agents, representatives,

3    and their family members.

4    47.    Plaintiff reserves the right to amend or otherwise alter the definitions of the Class

5    presented to the Court at the appropriate time, or propose or eliminate sub-Classes in response to

6    facts learned through discovery, legal arguments advanced by Defendants or otherwise.

7    48.    <u>Numerosity</u>:  The Class is so numerous that the individual joinder of all members is

8    impracticable under the circumstances of this case.  While the exact number of Class members is

9    unknown at this time, Plaintiff is informed and believes that the Class consists of thousands of

10    members.

11    49.    <u>Commonality</u>: Common questions of law or fact are shared by members of the Class.

12    This action is suitable for class treatment because these common questions of fact and law

13    predominate over any individual issues.  Such common questions include, but are not limited to, the

14    following:

15    (1)    Whether Defendants' acts and practices violate the Truth in Lending Act 15

16    U.S.C. § 1601, *et seq.*;

17    (2)    Whether Defendants' conduct violated 12 C.F.R. § 226.17;

18    (3)    Whether Defendants' conduct violated 12 C.F.R. § 226.19;

19    (4)    Whether Defendants engaged in unfair business practices aimed at deceiving

20    Plaintiff and Class members before and during the loan application process;

21    (5)    Whether Defendants, by and through their officers, employees, and agents

22    failed to disclose that the interest rate actually charged on these loans was

23    higher than the rate represented and promised to Plaintiff and Class members;

24    (6)    Whether Defendants, by and through their officers, employees and agents

25    concealed, omitted and/or otherwise failed to disclose information they were

26    mandated to disclose under TILA;

27    (7)    Whether Defendants failed to disclose the true variable nature of interest rates

28    on adjustable rate mortgage loans and adjustable rate home equity loans;

(8)   Whether Defendants failed to properly disclose the process by which negative amortization occurs, ultimately resulting in the recasting of the payment structure over the remaining lifetime of the loans;

(9)   Whether Defendants' failure to apply Plaintiff's and Class members' payments to principal as promised in the form Notes constitutes a breach of contract, including a breach of the covenant of good faith and fair dealing;

(10)  Whether Defendants' conduct in immediately raising the interest rate on consumers' loans so that no payments were made to the principal balance constitutes a breach of the covenant of good faith and fair dealing;

(11)  Whether Defendants' scheme misleadingly portrayed or implied that these loans were fixed rate loans, when Defendants knew that only the periodic payments were fixed (for a time) but that interest rates were not "fixed;"

(12)  Whether the terms and conditions of Defendants' Option ARM home loan are unconscionable;

(13)  Whether Plaintiff and the Class are entitled to damages;

(14)  Whether Plaintiff and the Class are entitled to punitive damages; and

(15)  Whether Plaintiff and the Class are entitled to rescission.

50.   <u>Typicality</u>:  Plaintiff's claims are typical of the claims of Class members.  Plaintiff and Class members were subjected to the same kind of unlawful conduct and the claims of Plaintiff and Class members are based on the same legal theories.

51.   <u>Adequacy</u>:  Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other members of the Class Plaintiff seeks to represent. Plaintiff has retained counsel competent and experienced in complex class action litigation and Plaintiff intends to prosecute this action vigorously.   The interests of the members of the Class will be fairly and adequately protected by Plaintiff and her counsel.

52.   <u>Ascertainable Class</u>:  The proposed Class is ascertainable in that the members can be identified and located using information contained in Defendants' records.

53.     This case is brought and can be maintained as a class action under Rule 23(b)(1), 23(b)(2), and 23(b)(3):

(a)     <u>Risk of Inconsistent Judgments</u>: The unlawful acts and practices of Defendants, as alleged herein, constitute a course of conduct common to Plaintiff and each Class member.  Prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants and/or substantially impair or impede the ability of individual Class members to protect their interests;

(b)     <u>Injunctive and/or Declaratory Relief to the Class is Appropriate:</u>  Defendants, and each of them, have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief with respect to the Class as a whole appropriate; and

(c)     <u>Predominant Questions of Law or Fact</u>:  Questions of law or fact common to Class members, including those identified above, predominate over questions affecting only individual Class members, if any, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class action treatment will allow a large number of similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would require.   Further, an important public interest will be served by addressing the matter as a class action.  The cost to the court system of adjudicating each such individual lawsuit would be substantial.

## VI.    FIRST CAUSE OF ACTION

### VIOLATIONS OF TRUTH IN LENDING LAWS, 15 U.S.C. § 1601, *et seq*.

**(Against Defendants ComUnity Lending, Inc., Greenwich Capital
Financial Products, Inc., Wells Fargo Bank, N.A. and Does 4 -10)**

54.     Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

55.     15 U.S.C. § 1601, *et seq*., is the Federal Truth in Lending Act ("TILA").  The Federal Reserve Board of Governors implements TILA through Regulation Z (12 C.F.R. § 226 )

and its Official Staff Commentary ("FRB Commentary").  Compliance by lenders with Regulation Z became mandatory on October 1, 1982.  Likewise, Official Staff Commentary issued by the Federal Reserve Board is also binding on all lenders.

56.    The purpose of TILA is to protect consumers.  This is stated in 12 C.F.R. § 226.1, which reads:

> **§ 226.1 Authority, purpose, coverage, organization, enforcement and liability. . .**
>
> (a)    Purpose.  The purpose of this regulation is to promote the informed use of consumer credit by requiring disclosures about its terms and costs.  The regulation also gives consumers the right to cancel certain credit transactions that involve a lien on a consumer's principal dwelling . . .

57.    Regulation Z also mandates very specific disclosure requirements regarding home loans with which lenders, including Defendants, must comply:

> **§ 226.17. General disclosure requirements.**
>
> (a)    Form of disclosures. (1) The creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep. The disclosures shall be grouped together, shall be segregated from everything else, and shall not contain any information not directly related to the disclosures required under § 226.18.

58.    The purpose of TILA is to assure meaningful disclosure of credit terms so that borrowers will be able to compare more readily the various credit terms available to them and avoid the uninformed use of credit and to protect consumers against inaccurate and unfair credit billing practices.

59.    Defendants' Option ARM loan violates TILA because Defendants failed to comply with the disclosure requirements mandated by Regulation Z and FRB Commentary.  Defendants failed in a number of ways to clearly, conspicuously and/or accurately disclose the terms of the

Option ARM loan to Plaintiff and Class members as Defendants were required to do under TILA. These violations are apparent on the face of the Note, the TILDS and other loan documents.

60.    The TILA violations committed by Defendants are more specifically detailed as follows:

**A.    Defendants' Failure to Clearly and Conspicuously Disclose A Single APR Violates Truth in Lending Laws**

61.    15 U.S.C. § 1638(a)(4) requires lenders to disclose only one annual percentage rate ("APR") and not an additional APR that is only applicable for the first 30 days of a loan.

62.    FRB Commentary to 12 C.F.R. § 226.17(C)-6 requires that the APR must "reflect a composite annual percentage rate based on the initial rate for as long as it is charged and, for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation."

63.    15 U.S.C. § 1638(a)(8) and 12 C.F.R. § 226.18(e) also require lenders to provide a descriptive explanation of the APR.

64.    12 C.F.R. § 226.18(e) defines "APR" as the cost of credit expressed as a yearly rate.

65.    12 C.F.R. § 226.17 and 12 C.F.R. § 226.19 require lenders to make disclosures concerning the APR in a clear and conspicuous manner and a misleading disclosure is as much a violation of TILA as a failure to disclose at all.

66.    In addition, FRB Commentary to § 226.17(a)(1)-1 provides that TILA's clear and conspicuous requirement applies to the disclosure and explanation of the cost of the loan as an APR, and where there is a contradiction between the TILDS and other information provided to the borrower, the disclosure is unclear.

67.    At all relevant times during the liability period, Defendants provided Plaintiff and Class members with Notes that state, at 2(A), "I will pay interest at a ***yearly rate*** of 1.000%." However, in the TILDS, in the box entitled "ANNUAL PERCENTAGE RATE" it describes the APR as "[t]he cost of your credit as a ***yearly rate***" and then lists an APR of "8.406%."  (emphasis added).

68.     At all relevant times during the liability period, Defendants violated 12 C.F.R. § 226.17(a)(1)-1 by listing two completely different APRs in the loan documents.  In particular, for Plaintiff, the TILDS lists an APR of 8.406%, while the Note lists an APR of "1.000%."

69.     At all relevant times during the liability period, Defendants failed to clearly and conspicuously explain in the Note or TILDS that the low APR (the same APR upon which Defendants based the written payment schedule provided to Plaintiff and Class members) was only offered for the first thirty days of the loan.

70.     At all relevant times during the liability period, Defendants also failed to clearly, conspicuously and accurately disclose the APR that they charged Plaintiff and Class members on their loans.  Defendants also failed to disclose to, and by omission, failed to inform Plaintiff and Class members that the APR listed in the TILDS was not the APR used to determine the first five years of payments listed in the very same TILDS; rather, Defendants listed payments amounts for the first five years of the loan based on the APR listed in the Note which was correct for *only* thirty days.

71.     At all relevant times during the liability period, Defendants created and caused the contradiction in the loan documents they provided to Plaintiff and Class members by purposefully disclosing two different APRs.

**B.     Defendants' Failure to Clearly and Conspicuously Disclose That the Payment Schedules Are Not Based on the APR Stated in the TILDS Violates TILA**

72.     12 C.F.R. § 226.17 and 12 C.F.R. § 226.19 require the lender to make disclosures concerning the annual interest rate and payments in a clear and conspicuous manner.  Further, a misleading disclosure is as much a violation of TILA as a failure to disclose at all.

73.     As for Plaintiff's and Class members' Option ARM loans, Defendants violated 12 C.F.R. § 226.17 and 12 C.F.R. § 226.19 in that they failed to clearly and conspicuously disclose the annual interest rate upon which the payments listed in the TILDS are based.

74.     The scheduled payment amounts and APR listed in the Note and TILDS for each of the subject loans are unclear and inconspicuous.  In fact, the payment amounts for the first three to

five years are not based on the APR listed in the TILDS but instead, were based upon an APR listed in the Note that existed for only thirty days.

75.    At all relevant times, Defendants knowingly and intentionally included in each of the TILDS a schedule of payments which was not based upon the interest rate listed in these same documents.  Defendants' failure to clearly and conspicuously disclose the payment amounts due based on the listed APR was and is deceptive.

76.    Worse still, the other documents and representations supplied by Defendants expressly and/or impliedly represented that Plaintiff's payments would be applied to both principal and interest.  That suggested that the payments listed on the TILDS were consistent with the interest rate actually applicable to the loan, when they in fact were not.  In truth, if Plaintiff made payments according to the schedule provided in the TILDS, the payments were guaranteed to be insufficient to pay the principal and interest on the loan and, thus, negative amortization was not just a mere possibility, it was an absolute certainty.

77.    At all relevant times, Defendants failed to clearly and conspicuously disclose to Plaintiff and Class members that if they made payments according to the payment schedule set forth in the TILDS, negative amortization was not just a mere possibility, it was an absolute certainty.

78.    At all relevant times, Defendants purposefully and intentionally failed to disclose to Plaintiff and Class members, the interest rate upon which the payment schedule was based and thereby misled Plaintiff and Class members into believing that they would be getting a loan with a low fixed payment rate that would be sufficient to pay both interest and principal.

79.    At all relevant times, the payment amount provided by Defendants was intended to and did deceive consumers into falsely believing that they would receive the low interest rate upon which the payment schedule is based.  While the Note states the amount of Plaintiff's initial monthly payment, the initial monthly payment amounts stated in the Note and TILDS are not in any way related to the interest rate listed in the Note and TILDS.

80.    Defendants employed the aforementioned bait-and-switch tactics on a common and uniform class-wide basis.  In particular, had Defendants clearly and conspicuously disclosed a

payment amount sufficient to cover both principal and interest, the payment amounts would have been almost double the payment amounts listed.

81.    The TILDS is also deceptive for much the same reason.  The TILDS list a schedule of payments, yet for up to five years the listed payment amounts have no relation to, and are also not based on, the annual interest rate listed in the TILDS.

82.    At all relevant times, Defendants failed to clearly, conspicuously, and accurately disclose a payment amount that corresponds to the APR being charged on the loan and that was sufficient to pay the true costs of the loan.  Plaintiff and Class members reasonably believed that if they made the payments according to Defendants' payment schedule, the payments would, in fact, be paying off the loan.   However, the true fact is that the payment amounts stated in Defendants' payment schedule did not include any principal on the loans at all and only covered a portion of the interest Defendants were charging on these loans.

83.    FRB Commentary to 12 C.F.R. § 226.17(a)(1) states that "this standard requires that disclosures be in a reasonably understandable form.  For example, while the regulation requires no mathematical progression or format, *the disclosures must be presented in a way that does not obscure the relationship of the terms to each other…*"  (emphasis added).

84.    At all relevant times, Defendants' Option ARM loans violated 12 C.F.R. § 226.17(a)(1) in that the amount of the payments, for the first several years of the loan term, bear no relationship to the interest rate listed in the TILDS.  Therefore, as a direct and proximate result, the form of disclosure used by Defendants obscured the relationship between the interest rate listed in the Note(s) and TILDS and the payment schedule provided.

**C.    Defendants' Failure to Clearly and Conspicuously Disclose Negative Amortization Violates the Truth in Lending Laws**

85.    12 C.F.R. § 226.19 sets forth additional specific disclosure requirements for residential home loans:

Certain residential mortgage and variable-rate transactions. . .

(b) Certain variable-rate transactions. If the annual percentage rate

may increase after consummation in a transaction secured by the

consumer's principal dwelling with a term greater than one year, the following disclosures must be provided at the time an application form is provided or before the consumer pays a non-refundable fee, whichever is earlier. . . (vii) *Any rules relating to changes in the index, interest rate, payment amount, and outstanding loan balance including, for example, an explanation of interest rate or payment limitations, negative amortization, and interest rate carryover.* (emphasis added).

86.    The negative amortization disclosure is required and must be made clearly and conspicuously, and done in a manner that does not obscure its significance.  The disclosure must state whether the loan and payments established under the terms dictated by the lender is a negative amortizing loan.

87.    In 1995, and continuing each time new FRB Commentary was issued, the Federal Reserve Board made clear that when the loan was a variable rate loan with payment caps, such as those that are the subject of this lawsuit, the disclosure requires a definitive statement about negative amortization:

12 CFR Part 226

[Regulation Z; Docket No. R-0863]

Monday, April 3, 1995

AGENCY: Board of Governors of the Federal Reserve System.

ACTION: Final rule; official staff interpretation.

"For the program that gives the borrower an option to cap monthly payments, the creditor must fully disclose the rules relating to the payment cap option, including the effects of exercising it (such as **negative amortization occurs** and that the principal balance **will increase**)" (Found at C.F.R. § 226.19) (emphasis added).

88.    At all relevant times, statutory and common law in effect make it unlawful for a lender, such as Defendants, to fail to comply with FRB Commentary as well as Regulation Z and TILA.

89.    The loans sold to Plaintiff and Class members are Option ARM loans which have a variable rate feature with payment caps.  Defendants failed to include any reference in the TILDS or in the Note(s) that negative amortization would occur if Plaintiff and Class members followed the payment schedule provided by Defendants.

90.    In fact, the only place in the Note where Defendants even inferentially reference negative amortization caused Plaintiff and Class members to believe that negative amortization is only a mere possibility, rather than an absolute certainty.  In fact, these loans were designed in such a way so as to make negative amortization an absolute certainty.  And even when a separate explanation was provided, Defendants omitted the important material fact that these loans and payment schedules would, in fact, guarantee negative amortization.

91.    Defendants' statement in the Note at ¶ 5(C) "my monthly payment *could* be less than or greater than the amount of interest owed each month" was an artfully contrived half-truth and did not alert or inform Plaintiff or Class members that the payment schedule would absolutely guarantee that negative amortization was going to occur on these loans.  Rather, Defendants made it appear that as long as the payments were made according to the schedule listed in the TILDS, there would be no negative amortization.

92.    Defendants' statements in the Note, TILDS, and any other disclosures they provided, described negative amortization as only a mere possibility, and therefore were misleading, deceptive and inconsistent with the requirements of TILA.

**D.    Defendants' Failure to Clearly and Conspicuously Disclose The Legal Obligation Violates Truth in Lending Laws**

93.    12 C.F.R. § 226.17(c)(1) requires that "[t]he disclosures shall reflect the terms of the legal obligation between the parties."

94.    The FRB Commentary to 12 C.F.R. § 226.17(c)(1) requires that:  "[t]he disclosures shall reflect the credit terms to which the parties are legally bound as of the outset of the transaction.

In the case of disclosures required under § 226.20(c), the disclosures shall reflect the credit terms to which the parties are legally bound when the disclosures are provided."

95.    This Commentary further states that "[i]f a loan contains a rate or payment cap that would prevent the initial rate or payment, at the time of the first adjustment, from changing to the rate determined by the index or formula at consummation, the effect of that rate or payment cap should be reflected in the disclosures."

96.    The FRB Commentary further states, at 12 C.F.R. § 226.17(c)(1)(2), that "[t]he legal obligation normally is presumed to be contained in the note or contract that evidences the agreement."

97.    At all relevant times during the liability period, Defendants' Option ARM loans violated 12 C.F.R. § 226.17(c) in that the Note and TILDS did not disclose, and by omission failed to disclose, the amounts that Plaintiff and Class members were legally obligated to pay.  In particular, borrowers' monthly obligations to Defendants (*i.e.,* the amount charged to them each month under the Note) were much higher than Defendants' disclosures indicated.  Defendants accomplished this deception by only listing a partial payment in the TILDS, rather than a payment amount that was sufficient to pay what these borrowers were being charged for their loans and were legally obligated to pay.

98.    As a direct and proximate result of Defendants' omissions and failures to clearly and conspicuously disclose Plaintiff's and Class members' legal obligations under the loans, Defendants took the partial payments and secretly added the deficit, each month, to principal, thereby causing negative amortization to occur.

**E.    Defendants' Failure to Disclose the Composite APR Violates Truth in Lending Laws**

99.    Defendants provided Plaintiff and Class members with multiple, conflicting annual interest rates when describing the costs of this loan.  On the TILDS, Defendants set forth one annual interest rate, while on the Note, Defendants set forth a different annual interest rate.

100.    FRB Commentary to 12 C.F.R. § 226.17(c)(6) requires that the APR must "reflect a composite annual percentage rate based on the initial rate for as long as it is charged and, for the

remainder of the term, the rate that would have been applied using the index or formula at the time of consummation." It also provides that "in a variable rate transaction with a . . . discounted or premium rate, *disclosures should not be based solely on the initial terms*. In those transactions, *the disclosed annual percentage rate should be a composite rate* based on the rate in effect during the initial period and the rate that is the basis of the variable rate feature for the remainder of the term." (emphasis added).

101.    The reason for this requirement is clear.  Consumers cannot make an informed decision when they cannot compare the cost of credit to other proposals.  It is therefore incumbent upon Defendants to show the composite interest rate in effect so that the borrowers can understand exactly what they will be paying for the loan.

102.    A lender violates TILA and Regulation Z by failing to list the composite annual interest rate in variable rate loans that have a discounted initial rate.  The Option ARM loan sold to Plaintiff and Class members by Defendants is a variable rate loan.  At all relevant times during the liability period, Defendants listed an annual interest rate in the Note that, in truth, would only be provided for the first thirty to forty-five days of a thirty year loan, and would, with one hundred percent certainty, be increased after that first month.  Because Defendants failed to clearly and conspicuously disclose the composite annual percentage rate on these loans, and instead listed a different interest rate in the documents provided to consumers, Defendants violated TILA and Regulation Z, and failed to provide disclosures that did not obscure relevant information.

103.    12 C.F.R. § 226.17 and 12 C.F.R. § 226.18 require lenders to make disclosures concerning the interest rates applicable to home loans in a clear and conspicuous manner.  A misleading disclosure is as much a violation of TILA as a failure to disclose.  Further, the regulations require lenders to present the interest rate disclosures "in a way that does not obscure the relationship of the terms to each other."  Defendants failed to meet the disclosure mandates required of them concerning the APR they actually applied to Plaintiff's and Class members' loans, as well as the interest rate Defendants actually charged to Plaintiff and Class members.

104.     Defendants' disclosure in the Note concerning the APR is, at best, unclear and inconspicuous.  At worst, it is intentionally deceptive.  In either case, it is certainly different from the APR set forth by Defendants in the TILDS.

105.     The APR set forth in the Note is the teaser rate that actually applied to the loan for only one month.  At no time did Defendants make it clear in the Note or TILDS that this low promised rate (the same rate upon which Defendants based the first three to five years of the written payment schedule they provided to Plaintiff and Class members) was absolutely certain to apply only for the first thirty days of the loan.  Instead, Defendants used terms like "may" when discussing potential interest rate increases, when in fact it was an absolute certainty that the interest rate listed would only be provided for the first thirty days of the loan, and would be raised when the first payment was due.

106.     Moreover, Defendants employed a convoluted, confusing and circuitous methodology in the Note to describe the interest rates applicable to the loan.  In one part of the Note, Defendants state that the promised low interest rate is the rate until the "change date."  A description of the change date is found in another part of the Note.  A description of how the interest rate is calculated on the change date is found in yet another part of the Note.  This disjointed method employed by Defendants to provide this information to consumers makes it extremely difficult, if not impossible, for anyone to determine that the change date corresponds to the very first monthly payment Plaintiff and Class members make on their loans and that the interest rate will certainly increase on that date.

107.     The convoluted language used by Defendants to disclose the interest rate on Plaintiff's and Class members' loans is not clear and conspicuous.  Rather, the disclosures used by Defendants were unclear and misleading.  Defendants' promise of a low interest rate is and was wholly illusory and the deception, as alleged herein, was uniformly practiced on Plaintiff and Class members by Defendants to facilitate sales of these ARM loans to consumers.

108.     Defendants further concealed the APR applicable to the loan when they identified the amount of Plaintiff's and Class members' initial monthly payments in the Note.  The "initial monthly payments" amount figure is exactly equal to what the payments would be if the APR listed

in the note as promised to Plaintiff actually applied to the principal balance on the loans. By identifying "initial monthly payments" based upon the Note APR, rather than the Composite APR, Defendants made their "disclosures" regarding the interest rate applicable to the loan unclear, inconspicuous and confusing. Thus, the "initial monthly payments" amount provided by Defendants was unclear and deceptive as it caused consumers to believe that they would, in fact, receive the teaser interest rate promised to them.

109. The payment schedule identified in the TILDS has the same effect. The TILDS lists monthly payment amounts for the first several years of the loan based on the low "teaser" rate. That payment schedule suggests that the 1% "teaser" rate is applied to the loan continuously throughout the first several years of the loan term. In truth, however, this payment schedule has no relation to the APR Defendants actually charged Plaintiff and Class members on their loans. As a result, that payment schedule made Defendants' other "disclosures" regarding the interest rate applicable to Plaintiff's and Class members' loans unclear, inconspicuous and confusing.

110. Defendants failed to clearly, conspicuously and accurately disclose the actual interest rate applied to Plaintiff's loan. Defendants also failed to disclose to, and by omission failed to inform Plaintiff that the payment amounts listed in the payment schedule did not include any amount for the principal on the loan and were in fact insufficient to pay all of the interest accruing. Based on the payment schedule listed in the Note and TILDS, Plaintiff and Class members reasonably believed that the payments would be sufficient to meet the loan obligations in the Note. However, the payment schedule provided by Defendants did not pay any principal on the loan and only included a partial payment towards the interest Defendants charged Plaintiff and Class members for these loans.

111. At all relevant times during the liability period, Defendants failed to clearly, conspicuously and accurately disclose in the Note and TILDS a payment amount that was sufficient to pay both principal and interest. Plaintiff reasonably believed that if she made the payments according to Defendants' payment schedule, the payments would, in fact, be paying off both principal and interest. However, the payment amounts stated in Defendants' payment schedule did

not include any principal on the loans at all and were only a partial payment of the interest Defendants were charging on these loans.

**F.    Defendants' Failure to Clearly and Conspicuously Disclose that the Initial Interest Rate is Discounted Violates TILA**

112.    Variable rate loans are based on a "margin" and an "index." The index is often the Prime Rate or the LIBOR exchange rate. The margin is the amount the lender charges over and above that indexed rate.

113.    TILA and Regulation Z require that when the interest rate on a loan is a "discounted rate" (*i.e.*, not based on the index and margin) a separate disclosure is required. The disclosure must also inform borrowers that, after the discounted rate falls away, the interest rate will increase and it must conspicuously describe all of the circumstances under which the interest rate will increase. Further, the disclosure must inform the borrower what the true cost of the loan is.

114.    The Federal Reserve Board has established disclosure requirements for variable rate loans. 26 C.F.R. § 226.19 requires lenders to disclose the frequency of interest rate and payment adjustments to borrowers. If interest rate changes will be imposed more frequently or at different intervals than payment changes, a creditor must disclose the frequency and timing of both types of changes.

115.    Here, the Note at issue only stated that the interest rate *may* increase in the future. However, it was absolutely certain, not merely possible, that the interest rate would increase above the initial, discounted rate. The interest rate was guaranteed to go up after 30 days, when the discounted interest rate expired. At all relevant times, Defendants failed to clearly, conspicuously and unambiguously disclose this critical fact as required by law.

116.    Further violating TILA's disclosure requirements, Defendants' loan documents state that the interest rate *may* increase during the term of this transaction if the index increases. That statement is incomplete and misleading, as an increase in the index was not the only thing that could cause an increase in the interest rate. Because the disclosed interest rate was discounted, it was absolutely certain to increase even without any change in the index. Thus, Defendants' disclosures were unclear, inconspicuous, ambiguous and misleading in violation of TILA.

117.    Defendants failed to disclose to, and by omission, failed to inform Plaintiff and Class members that the initial interest rate was discounted, and that it was absolutely certain to increase even when the index did not rise.  Due to the initial discounted interest rate being listed at 1.00%, the interest rate would increase because the index and margin were several points higher.  Even when Defendants did provide a disclosure that stated the initial payment was not based on the index, they did so in a manner that was not clear and conspicuous.  Because the loan documents failed to provide this extremely important material information in a clear and conspicuous manner that did not obscure its importance, Defendants' disclosure failed to satisfy the requirements of TILA.

118.    Defendants failed to disclose to Plaintiff and Class members that their interest rate was, with 100% certainty, going to increase, regardless of whether the index upon which their loans are based changed.  As such, Defendants violated TILA and Regulation Z by providing Plaintiff and Class members with unclear, deceptive and poorly drafted or intentionally misleading disclosures.

119.    Defendants also failed to disclose all of the ways by which the interest rate applicable to Plaintiff's and Class members' loans could increase, in violation of TILA.

**G.    Defendants' Failure to Clearly and Conspicuously Disclose the Effect of the Payment Cap on the True Cost of the Loan Violates Truth in Lending Laws**

120.    The Option ARM loans at issue contained a variable rate feature with an initial teaser rate with payment caps.  The payment cap is a limit on how much the payment may be increased annually.  Its purpose is to provide borrowers with a limit on how much their payment can increase from year to year.  The loans issued by Defendants had a 7.5% payment cap, which means that a borrower would only see their payment rise each year by a maximum of 7.5%.  (*i.e.*, a $1,000 monthly payment in year one, could go to a $1,075 payment in year two).

121.    FRB Commentary to 12 C.F.R. § 226.17(c)(1)(10)(iii)  states that "[i]f a loan contains a rate or payment cap that would prevent the initial rate or payment, at the time of the first adjustment, from changing to the rate determined by the index or formula at consummation, the effect of that rate or payment cap should be reflected in the disclosures."  Thus, at all relevant times during the liability period, Defendants had a duty to Plaintiff and Class members to disclose in the payment schedule of the TILDS the effect the payment cap would have on the loans.

122.    Defendants failed to disclose to, and by omission, failed to inform Plaintiff and Class members that the payment cap would cause hundreds, if not thousands of dollars, each month, to be secretly added to principal.

123.    As a direct and proximate result, Defendants failed to disclose to, and by omission, failed to inform Plaintiff and Class members of the effect of the payment cap in violation of 12 C.F.R. § 226.17.

124.    The violations of TILA and Regulation Z described in this Complaint are apparent on the face of the Note, TILDS and other disclosure documents provided to Plaintiff and Class members because the disclosures provided can be determined to be incomplete or inaccurate by a comparison among the TILDS, the other disclosure statements, and the Note described herein. ComUnity Lending, Inc. originally prepared and provided the Note, TILDS and other disclosure documents to Plaintiff and Class members.  Thereafter the loans were voluntarily sold and/or assigned to Greenwich Capital Financial Products, Inc., Wells Fargo Bank, N.A. and Does 4-10.  At no time did Greenwich Capital Financial Products, Inc., Wells Fargo Bank, N.A. or Does 4-10 correct or remedy any of the failures of disclosure or misleading disclosures described herein.

125.    As a direct and proximate result of Defendants' violations of TILA, as alleged herein, Plaintiff and Class members have suffered injury in an amount to be determined at time of trial.  If Defendants had not violated TILA and had instead clearly and conspicuously disclosed the material terms of Defendants' Option ARM loan, as alleged herein, Plaintiff and Class members would not have entered into the home loan contracts which are the subject of this action.  Because Defendants failed to make the proper disclosures required under TILA, Plaintiff and Class members now seek redress in an amount and/or type as proven at time of trial.

126.    WHEREFORE, Plaintiff and Class members are entitled to an order declaring that Defendants ComUnity Lending, Inc., Greenwich Capital Financial Products, Inc., Wells Fargo Bank, N.A. and Does 4-10 violated TILA, 15 U.S.C. §1601, *et seq.*, that Plaintiff and the Class have the right to rescind pursuant to 15 U.S.C. § 1635 and 12 C.F.R. § 226.23, attorneys fees, litigation costs and expenses and costs of suit, and for an order rescinding Plaintiff's individual mortgage and

those of any Class member desirous of such relief, and for an order awarding other relief as the Court deems just and proper.

## VII.    SECOND CAUSE OF ACTION

### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, BUS. & PROF. CODE § 17200, *et seq.*, - "UNLAWFUL" BUSINESS ACTS OR PRACTICES PREDICATED ON VIOLATIONS OF TILA

### (Against Defendants ComUnity Lending, Inc., Greenwich Capital Financial Products, Inc, Wells Fargo Bank, N.A. and Does 4-10)

127.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

128.    Plaintiff brings this cause of action on behalf of herself, on behalf of the Class and in her capacity as a private attorney general against Defendants for their unlawful business acts and/or practices pursuant to Cal. Bus. & Prof. Code § 17200, *et seq.*, which prohibits unlawful business acts and/or practices.

129.    Plaintiff asserts these claims as she is a representative of an aggrieved group and as a private attorney general on behalf of the general public and other persons who have expended funds that Defendants should be required to pay or reimburse under the equitable and restitutionary remedies provided by Cal. Bus. & Prof. Code § 17200, *et seq.*

130.    The unlawful acts and practices of Defendants alleged above constitute unlawful business acts and/or practices within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*

131.    By engaging in the above described acts and practices, Defendants have committed one or more acts of unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*

132.    Defendants' unlawful business acts and/or practices as alleged herein have violated numerous laws and/or regulations and said predicate acts are therefore *per se* violations of § 17200, *et seq.*  These predicate unlawful business acts and/or practices include Defendants' failure to comply with the disclosure requirements mandated by TILA, 15 U.S.C. § 1601, *et seq.*, Regulation Z and FRB Commentary.  And, as described in more detail above, Defendants also failed in a number of ways to clearly or accurately disclose the terms of the Option ARM loan to Plaintiff as required under TILA.

133.    Defendants' misconduct as alleged herein gave Defendants an unfair competitive advantage over their competitors.

134.    As a direct and proximate result of the aforementioned acts, Defendants, and each of them, received monies and continue to hold the monies expended by Plaintiff and others similarly situated who purchased the Option ARM loans as described herein.

135.    In addition to the relief requested in the Prayer below, Plaintiff seeks the imposition of a constructive trust over, and restitution of, the monies collected and realized by Defendants.

136.    The unlawful acts and practices, as fully described herein, present a continuing threat to members of the public to be misled and/or deceived by Defendants as described herein.  Plaintiff and other members of the general public have no other remedy of law that will prevent Defendants' misconduct as alleged herein from occurring and/or reoccurring in the future.

137.    As a direct and proximate result of Defendants' unlawful conduct alleged herein, Plaintiff and Class members have lost thousands if not millions of dollars of equity in their homes. Plaintiff and Class members are direct victims of Defendants' unlawful conduct, as herein alleged, and each has suffered injury in fact, and has lost money or property as a result of Defendants' unfair competition.

138.    WHEREFORE, Plaintiff and Class members are entitled to equitable relief, including restitution, restitutionary disgorgement of all profits accruing to Defendants because of their unlawful and deceptive acts and practices, attorneys' fees and costs, declaratory relief, and a permanent injunction enjoining Defendants from their unlawful activity.

## VIII.   THIRD CAUSE OF ACTION

## FRAUDULENT OMISSIONS

### (Against Defendants ComUnity Lending, Inc., Greenwich Capital Financial Products, Inc, Wells Fargo Bank, N.A. and Does 4-10)

139.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

140.    As alleged herein, pursuant to TILA, 15 U.S.C. § 1601, *et seq*., Regulation Z (12 C.F.R. § 226) and FRB Commentary, Defendants had a duty to disclose to Plaintiff and each Class member: (i) the actual interest rate being charged on the Note; (ii) that negative amortization would

occur and that the "principal balance *will* increase"; and (iii) that the initial interest rate on the note was discounted.

141.    Defendants further had a duty to disclose to Plaintiff and each Class member: (i) the actual interest rate being charged on the Note; (ii) that negative amortization would occur and that the "principal balance *will* increase"; and (iii) that the initial interest rate on the Note was discounted, based upon Defendants' partial representations of material facts when Defendants had exclusive knowledge of material facts that negative amortization was certain to occur.

142.    Defendants did not disclose these facts that they had a duty to disclose.  Instead, they concealed them.

143.    The Note states at ¶ 3(A) "I will pay principal and interest by making a payment every month" and "I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note."  The Note then states at ¶ 5(B), while referencing the Payment Cap provision, "[t]his Payment Cap applies only to the Principal and Interest payment . . ."  And, in ¶ 8(A), under the heading "BORROWER'S FAILURE TO PAY AS REQUIRED," the Note states "[t]he amount of the charge will be 5.000% of *my overdue payment of principal and interest*." (emphasis added).  However, the truth was that Plaintiff's payments would not be and were not applied to both principal and interest because the payment rate Defendants provided was insufficient to pay both principal and interest.  In fact, the payment rate was not even sufficient to pay all of the interest, causing negative amortization to occur.

144.    The Note further states at ¶ 5(C), "my monthly payment *could be less* than or greater than the amount of interest owed each month.  For each month that my monthly payment is less than the interest owed, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal." (emphasis added).  However, the payment schedules provided by Defendants in the TILDS were absolutely incapable of covering the amount of interest due and therefore these statements were false in that they omitted this material fact.

145.    The Notes list an interest rate and a payment amount based on that initial interest rate. However, the TILDS given to Plaintiff and Class members and never corrected by any of the Defendants includes a schedule of payments which includes that initial payment rate, but discloses a different interest rate. In truth, the payment schedule stated in the TILDS is wholly unrelated to the true interest rate being charged on the loans and, at all relevant times during the liability period, Defendants failed to disclose to, and by omission failed to inform, Plaintiff and Class members of this important material information.

146.    The aforementioned omitted information was not known to Plaintiff and Class members. At all relevant times, Defendants failed to disclose and/or actively concealed it by making such statements and partial, misleading representations alleged herein to Plaintiff and Class members. Because the Option ARM loans did not provide a low interest rate for the first three to five years of the Note, and the payment rate disclosed by Defendants was insufficient to pay both principal and interest, negative amortization occurred.

147.    Defendants, and each of them, failed to disclose to, and by omission failed to inform Plaintiff and Class members that: (i) the payment rate provided to Plaintiff and Class members on the TILDS was insufficient to pay both principal and interest; (ii) negative amortization was absolutely certain to occur if Plaintiff and Class members made payments according to the payment schedule provided by Defendants; and (iii) loss of equity and/or loss of Plaintiff's and Class members' residences was substantially certain to occur if Plaintiff and Class members made payments according to the payment schedule provided by Defendants.

148.    As alleged herein, Defendants had a duty to disclose to Plaintiff and Class members, and at all relevant times, failed to disclose and/or concealed material facts by making partial representations of some material facts when Defendants had exclusive knowledge of material facts, including but not limited to, (i) that the disclosed interest was not the actual interest rate charged on the Note; (ii) that negative amortization was certain to occur, and (iii) that the initial rate was discounted. The concealed and omitted information was not known to Plaintiff and Class members. Because the Option ARM loans did not provide a low interest rate for the first three to five years of

the Note, and the payment rate disclosed by Defendants was insufficient to pay both principal and interest, negative amortization occurred.

149.    From the inception of the Option ARM loan scheme until the present, Defendants have engaged in a purposeful and fraudulent scheme to omit material facts known solely to them, and not reasonably discoverable by Plaintiff and Class members, regarding the true facts concerning the actual interest rate charged on the loans, that negative amortization that was certain to occur, and that the initial interest rate was discounted, all of which Defendants were duty bound to clearly and conspicuously disclose to Plaintiff and Class members in the TILDS.

150.    Defendants have known from the inception of their Option ARM loan scheme that these loans: (i) do not provide the promised initial interest rate for the first three to five years of the Note, (ii) that negative amortization would occur and that Plaintiff's and Class members' principal balances would increase, and (iii) that the initial interest rate was discounted and did not accurately reflect the interest that consumers were being charged on the loans.

151.    Defendants purposefully and intentionally devised this Option ARM loan scheme to defraud and/or mislead consumers into believing that these loans would provide a low-interest rate loan for the first three to five years of the Note and that if they made their payments according to the payment schedule provided by Defendants that it would be sufficient to pay both principal and interest.

152.    The omitted information, as alleged herein, was material to Plaintiff and Class members.  Had the information been disclosed, Plaintiff and Class members would not have entered into the loans.

153.    As a direct and proximate result of Defendants' failures to disclose and omission of material facts, as alleged herein, Plaintiff and Class members have suffered damages, which include, but are not limited to, the loss of equity Plaintiff and Class members had in their homes prior to entering these loans.

154.    The wrongful conduct of Defendants, as alleged herein, was willful, oppressive, immoral, unethical, unscrupulous, substantially injurious, malicious and in conscious disregard for the well being of Plaintiff and Class members.  Accordingly, Plaintiff and Class members seek

1  punitive damages against Defendants in an amount to deter Defendants from similar conduct in the

2  future.

3       155.    WHEREFORE, Plaintiff and Class members are entitled to all legal and equitable

4  remedies provided by law, including but not limited to actual damages, exemplary damages,

5  prejudgment interest and costs.

6  ## IX.    FOURTH CAUSE OF ACTION

7  ### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW,
8  ### BUS. & PROF. CODE § 17200, *et seq.* - "UNFAIR" AND "FRAUDULENT" BUSINESS ACTS OR PRACTICES

9  ### (Against Defendants ComUnity Lending, Inc., Greenwich Capital
10  ### Financial Products, Inc., Wells Fargo Bank, N.A. and Does 4-10)

11       156.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

12       157.    Plaintiff brings this cause of action on behalf of herself, on behalf of the Class and in

13  her capacity as a private attorney general against Defendants for their unfair, fraudulent and/or

14  deceptive business acts and/or practices pursuant to Cal. Bus. & Prof. Code § 17200, *et seq.*, which

15  prohibits all unfair and/or fraudulent business acts and/or practices.

16       158.    Plaintiff asserts these claims as she is a representative of an aggrieved group and as a

17  private attorney general on behalf of the general public and other persons who have expended funds

18  that the Defendants should be required to pay or reimburse under the equitable and restitutionary

19  remedies provided by Cal. Bus. & Prof. Code § 17200, *et seq.*

20       159.    The instant claim is predicated on the generally applicable duty of any contracting

21  party to not misrepresent material facts and on the duty to refrain from unfair and deceptive

22  business practices.  Plaintiff and Class members hereby seek to enforce a general proscription of

23  unfair business practices and the requirement to refrain from deceptive conduct.  The instant claim

24  is predicated on duties that govern anyone engaged in any business and anyone contracting with

25  anyone else.

26       160.    At all relevant times, Defendants engaged in a pattern of deceptive conduct and

27  concealment aimed at maximizing the number of borrowers who would accept their Option ARM

28  loan.  Defendants, and each of them, sold Plaintiff and Class members a deceptively devised

financial product.  Defendants sold their Option ARM loan product to consumers, including Plaintiff, in a false or deceptive manner.  Defendants represented to the general public through brochures, flyers and other substantially identical materials, a loan which appeared to have a very low, fixed interest rate for a period of three to five years and no negative amortization.  Further, Defendants disguised from Plaintiff and Class members the fact that Defendants' Option ARM loan was designed to, and did, cause negative amortization to occur.

161.    Defendants lured Plaintiff and Class members into the Option ARM loan with promises of low fixed interest rates.  Once Plaintiff and Class members entered into these loans, Defendants switched the interest rate charged on the loans to a much higher rate than the one they advertised and promised to Plaintiff and Class members.  After entering these loans, Plaintiff and Class members could not escape because Defendants purposefully included in these loans an extremely onerous prepayment penalty that made it prohibitively expensive for consumers to extricate themselves from these loans.

162.    Plaintiff and Class members were consumers who applied for a mortgage loan through Defendants.  During the loan application process, in each case, Defendants uniformly represented to Plaintiff and Class members that in accepting these loan terms, Plaintiff and Class members would be able to lower their mortgage payment and save money.

163.    Defendants represented their Option ARM loan as having a low fixed interest rate, *i.e.*, typically between 1% and 3%.  However, Defendants did not disclose that this was just a "teaser" rate, the purpose of which was to get consumers to enter into loan agreements with Defendants.  Defendants did not disclose to Plaintiff and Class members that the "teaser" rate was not the fixed rate that Defendants would actually charge Plaintiff and Class members on their outstanding loan balances.

164.    Based on Defendants' representations and conduct, Plaintiff and Class members agreed to finance their primary residences through Defendants' Option ARM loans.  Plaintiff and Class members were told they were being sold a home loan with a low interest rate, fixed for the first three to five years of the loan.  Plaintiff and Class members were also led to believe that if they made payments based on this advertised interest rate, and the payment schedule provided to them

by Defendants, the loan was a no negative amortization home loan. After the fixed interest period, Plaintiff and Class members were told their rate "may" change. Plaintiff and Class members believed they would then be able to re-finance to another home loan. Plaintiff and Class members believed these facts to be true because that is what Defendants led consumers to believe.

165.    Defendants aggressively sold their Option ARM product as a fixed low interest rate home loan. Defendants knew that if positioned in such a manner, their Option ARM loan product would be a hugely popular and profitable product for them. Defendants also knew, however, that they were selling their product in a false and deceptive manner. While Defendants trumpeted their low, fixed rate loans to the public, Defendants knew, however, that this was not entirely true.

166.    In fact, Defendants' Option ARM loan possessed a low, fixed *payment* but not a low, fixed interest rate. Unbeknownst to Plaintiff and Class members, the actual interest rate they were charged on their loans was not fixed. After purchasing Defendants' Option ARM loan product, Plaintiff and Class members never actually received the benefit of the low advertised interest rate, or, in some cases, consumers received the low rate for just a single month. Immediately thereafter, Defendants in every instance and for every loan increased the interest rate they charged Plaintiff and Class members. Once Plaintiff and Class members accepted Defendants' Option ARM loan, they had no viable option to extricate themselves because these loan agreements included a draconian pre-payment penalty.

167.    Defendants perpetrated a bait and switch scheme on Plaintiff and Class members. Defendants' conduct and failure to disclose the whole truth about the loan's interest rate and describing the loan as having a fixed interest rate was deceptive and unfair. Defendants initiated this scheme in order to maximize the amount of the loans issued to consumers and to maximize Defendants' profits.

168.    The acts, misrepresentations, omissions, and practices of Defendants alleged above constitute unfair, and/or fraudulent business acts and/or practices within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*

169.    By engaging in the above described acts and practices, Defendants have committed one or more acts of unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*

170.    Defendants' conduct, as fully described above, was likely to deceive members of the consuming public, and at all times, Defendants' failures to disclose and omission of material facts have been and continue to be unfair, fraudulent, untrue and/or deceptive.

171.    Defendants' misconduct as alleged herein gave Defendants an unfair competitive advantage over their competitors.

172.    As a direct and proximate result of the aforementioned acts, Defendants, and each of them, received monies and continue to hold the monies expended by Plaintiff and others similarly situated who purchased the Option ARM loans as described herein.

173.    In addition to the relief requested in the Prayer below, Plaintiff seek the imposition of a constructive trust over, and restitution of, the monies collected and realized by Defendants.

174.    The harm to Plaintiff, members of the general public and others similarly situated outweighs the utility of Defendants' policies, acts and/or practices, and consequently, Defendants' conduct herein constitutes an unlawful business act or practice within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*

175.    The unfair, deceptive and/or fraudulent business practices of Defendants, as fully described herein, present a continuing threat to members of the public to be misled and/or deceived by Defendants' Option ARM loans as described herein.  Plaintiff and other members of the general public have no other remedy at law that will prevent Defendants' misconduct as alleged herein from reoccurring in the future.

176.    As a direct and proximate result of Defendants' unfair and/or fraudulent conduct alleged herein, Plaintiff and Class members have lost thousands if not millions of dollars of equity in their homes.  Plaintiff and Class members are direct victims of the Defendants' unlawful conduct, and each has suffered injury in fact, and has lost money or property as a result of Defendants' unfair competition.

177.    WHEREFORE, Plaintiff and Class members are entitled to equitable relief, including restitution, restitutionary disgorgement of all profits accruing to Defendants because of their unfair, fraudulent, and deceptive acts and/or practices, attorneys' fees and costs, declaratory relief, and a permanent injunction enjoining Defendants from their unfair, fraudulent and deceitful activity.

## X.    FIFTH CAUSE OF ACTION
## BREACH OF CONTRACT
### (Against All Defendants)

178.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

179.    Plaintiff and Class members entered into written home loan agreements with ComUnity Lending, Inc., which agreements were subsequently sold or assigned to Greenwich Capital Financial Products, Inc., Wells Fargo Bank, N.A. and Does 4-10.  Defendant GMAC Mortgage, LLC is the "servicer" on the loans at issue here and, in that capacity, is responsible for enforcing provisions of the Note relevant to this claim and applying Plaintiff's and Class members' payments in the manner required by the Notes.

180.    The Notes were drafted by Defendants and could not be modified by Plaintiff or Class members due to Defendants' superior bargaining position.  The Notes were offered to Plaintiff and the Class on a take it or leave it basis.  As such, the Notes at issue are contracts of adhesion.  The Notes describe the terms and respective obligations applicable to the parties herein.

181.    The Notes describe Plaintiff's and Class members' interest rate on the loan as a low interest rate, typically between 1% and 3%.  In addition, as required by federal law, Defendants provided a TILDS concerning the home loan agreement that shows a payment schedule based on that low 1% to 3% interest rate.  For the first three to five years the payment schedule shows that Plaintiff's and Class members' monthly payment obligations to Defendants are the exact payments necessary to pay off all principal and interest during the terms of the loans if, indeed, the interest rate actually charged by Defendants on the loans was the low interest rate promised.

182.    Defendants expressly and/or through their conduct and actions impliedly agreed that Plaintiff's and Class members' monthly payment obligations would be sufficient to pay and would

be applied to pay both the principal and interest owed on the loans. Defendants breached this agreement and never applied any of Plaintiff's and the Class members' payments to principal.

183.    The written payment schedules provided to Plaintiff reinforced the promise that Plaintiff's and Class members' payments would be applied to both principal and interest. Those schedules show that the payment amounts owed by Plaintiff and Class members in year one are exactly equal to the amount required to pay off the loan if, indeed, the interest actually charged on the loan was the low interest rate promised. Had the Defendants done as promised, the payments would have been sufficient to pay both principal and interest.

184.    Instead, Defendants immediately raised Plaintiff's and Class members' interest rates and applied **no part** of Plaintiff's or Class members' payments to the principal balances on their loans. In fact, because Defendants charged more interest than was agreed to, the payments, as disclosed by Defendants, were insufficient to cover the interest charge and thus principal balances increased (which is the negative amortization built into the loan).

185.    Defendants breached the written contractual agreement by failing to apply any portion of Plaintiff's and Class members' monthly payments towards their principal loan balances.

186.    Plaintiff and Class members, on the other hand, did all of the things the contract required of them. Plaintiff and Class members made monthly payments in the amount required by the terms of the Note and reflected in the payment schedule prepared by Defendants.

187.    As a result of Defendants' breach of the agreement, Plaintiff and Class members have suffered harm. Plaintiff and Class members have incurred additional charges to their principal loan balance. Plaintiff and Class members have incurred and will continue to incur additional interest charges on the principal loan balance and surplus interest added to Plaintiff's and Class members' principal loan balance. Furthermore, Defendants' breach has placed Plaintiff and Class members in danger of losing their homes through foreclosure as Defendants have caused Plaintiff's and Class members' principal loan balances to increase and limited these consumers' ability to make their future house payments or obtain alternative home loan financing.

188.    At all relevant times, there existed a gross inequality of bargaining power between the parties to the Option ARM loan contracts. At all relevant times, Defendants unreasonably and

unconscionably exploited their superior bargaining position and foisted upon Plaintiff and Class members extremely harsh, one-sided provisions in the contract, which Plaintiff and Class members were not made aware of and did not comprehend (*e.g.*, Defendants' fraud and failures to clearly and conspicuously disclose as alleged herein), and which attempted to severely limit Defendants' obligations under the contracts at the expense of Plaintiff and Class members, as alleged herein.  As a result of these extremely harsh, one-sided provisions, including but not limited to the provisions which limit the "teaser" interest rate for one month or less, these provisions are unconscionable and therefore unenforceable.

189.    WHEREFORE, Plaintiff and Class members are entitled to declaratory relief, compensatory damages proximately caused by Defendants' breach of contract as alleged herein, pre-judgment interest, costs of suit and other relief as the Court deems just and proper.

## XI.    SIXTH CAUSE OF ACTION

### TORTIOUS BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

**(Against Defendants ComUnity Lending, Inc., Greenwich Capital Financial Products, Inc., Wells Fargo Bank, N.A. and Does 4-10.)**

190.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

191.    Defendants entered into or were the assignees of written agreements with Plaintiff and Class members based on representations Defendants made directly and indirectly to Plaintiff and Class members about the terms of their loans.

192.    Defendants expressly represented to Plaintiff and Class members that they would provide loans secured by Plaintiff's and Class members' homes, and that the loans would have a promised fixed low interest rate for a period of three to five years.

193.    Defendants also represented that if Plaintiff and Class members made the monthly payments in the amount prescribed by Defendants that no negative amortization would occur.  The Note expressly states and/or implies that Plaintiff's and Class members' monthly payment obligation *will* be applied to pay both principal and interest owed on the loan.

194.    The written payment schedules prepared by Defendants that were applicable to Plaintiff's and Class members' loans, show that the payment amounts owed by Plaintiff and Class

members to Defendants in year one are exactly equal to the amount required to pay off the loan pursuant to an amortization schedule based upon the low interest rate promised.  If Defendants acted as they promised, the payments would have been sufficient to pay both principal and interest.

195.    Instead, Defendants immediately raised Plaintiff's and Class members' interest rate and applied **no part** of Plaintiff's and Class members' payments to principal.  Moreover, because Defendants charged more interest than was disclosed and agreed to in the loans, Plaintiff's and Class members' payments were insufficient to cover the interest that Defendants charged resulting in an increase in the amount of principal Plaintiff and Class members owed on their homes.

196.    Defendants unfairly interfered with Plaintiff's and Class members' rights to receive the benefits of the contract.  These loans will cost Plaintiff and Class members thousands of dollars more than represented by Defendants.  Plaintiff and Class members did not receive the fixed low interest rate home loan promised them by Defendants.  Defendants have caused Plaintiff and Class members to lose equity in their homes and therefore have denied Plaintiff and Class members the enjoyment and security of one of their most important investments.

197.    Plaintiff and Class members, on the other hand, performed all of the actions that the contract required of them.  Plaintiff and Class members made monthly payments in the amount required by the terms of the Note and reflected in the payment schedule prepared by Defendants.

198.    At all relevant times, Defendants unreasonably denied Plaintiff and Class members the benefits promised to them under the terms of the Note, including but not limited to a low interest rate for the first three to five years of the loan, clear and conspicuous disclosure of a payment amount sufficient to pay both principal and interest so as to avoid negative amortization, and the other failures to comply with the disclosure requirements mandated by TILA, 15 U.S.C. § 1601, *et seq.*, Regulation Z and FRB Commentary, as alleged herein.

199.    Knowing the truth and motivated by profit and market share, Defendants have knowingly and willfully breached the implied covenant of good faith and fair dealing by engaging in the acts and/or omissions to mislead and/or deceive Plaintiff and others similarly situated as alleged herein.

200.    Defendants' breaches, as alleged herein were committed with willful and wanton disregard for whether or not Plaintiff or Class members would actually receive a home loan that would provide the promised low interest and payment rate for the first three to five years of the loan sufficient to pay both principal and interest.

201.    Upon information and belief and at all relevant times, Defendants possessed full knowledge and information concerning the above facts about the Option ARM loans, and otherwise sold these Option ARM loans throughout the United States, including in the State of California.

202.    Defendants' placing of their corporate and/or individual profits over the rights of others is particularly vile, base, contemptible, and wretched and said acts and/or omissions were performed on the part of officers, directors, and/or managing agents of each corporate defendant and/or taken with the advance knowledge of the officers, directors, and/or managing agents who authorized and/or ratified said acts and/or omissions.  Defendants thereby acted with malice and complete indifference to and/or conscious disregard for the rights and safety of others, including Plaintiff and Class members.

203.    At all relevant times, Defendants' conduct, as alleged herein, was malicious, oppressive, and/or fraudulent.

204.    As a result of Defendants' conduct, Plaintiff and Class members have suffered harm. Plaintiff and Class members have incurred additional charges to their principal loan balance. Plaintiff and Class members have incurred and will continue to incur additional interest charges on the principal loan balance and surplus interest added to Plaintiff's and Class members' principal loan balance.  Furthermore, Defendants' breach has caused and/or otherwise placed Plaintiff and Class members in danger of losing their homes through foreclosure and, as a direct and proximate result of said misconduct, caused Plaintiff's and Class members' principal loan balances to increase, which has limited these consumers' ability to make their future mortgage payments or obtain alternative home loan financing.

205.    WHEREFORE, Plaintiff and Class members are entitled to declaratory relief, all damages proximately caused by Defendants' breach of the implied covenant of good faith and fair

1  dealing as alleged herein, punitive damages, pre-judgment interest, costs of suit and other relief as

2  the Court deems just and proper.

3                              **XII.    PRAYER FOR RELIEF**

4          WHEREFORE, Plaintiff prays for judgment against each Defendant jointly and severally, as

5  follows:

6          A.      An order certifying this case as a class action and appointing Plaintiff and her

7  counsel to represent the Class;

8          B.      For actual damages according to proof;

9          C.      For compensatory damages as permitted by law;

10         D.      For consequential damages as permitted by law;

11         E.      For statutory damages as permitted by law (against all Defendants other than GMAC

12                 Mortgage, LLC);

13         F.      For punitive damages as permitted by law (against all Defendants other than GMAC

14                 Mortgage, LLC);

15         G.      For rescission (against all Defendants other than GMAC Mortgage, LLC);

16         H.      For equitable relief, including restitution (against all Defendants other than GMAC

17                 Mortgage, LLC);

18         I.      For restitutionary disgorgement of all profits (against all Defendants other than

19                 GMAC Mortgage, LLC) obtained as a result of their unfair competition;

20         J.      For interest as permitted by law;

21         K.      For Declaratory Relief;

22         L.      For a mandatory injunction requiring Defendants to permanently include in every

23  Option ARM loan and disclosure statement: (i) clear and conspicuous disclosure of the APR on the

24  Note(s) and disclosure statement(s) as required under 12 C.F.R. § 226.17 by; (ii) clear and

25  conspicuous disclosure in the Note(s) and the disclosure statement(s) that payments on the variable

26  interest rate loan during the initial period at the teaser rate will result in negative amortization and

27  that the principal balance will increase as required under 12 C.F.R. § 226.19; and (iii) clear and

28  conspicuous disclosure that the initial interest rate provided is discounted and does not reflect the

1  actual interest that Plaintiff would be paying on the Note(s).

2      M.    For reasonable attorneys' fees and costs; and

3      N.    For such other relief as is just and proper.

4

5  DATED:    _____, 2008                    **DREIER LLP**

6                                             By:
                                             Lee A. Weiss (admitted *pro hac vice*)
7                                             lweiss@dreierllp.com
                                             Rebecca Tingey (admitted *pro hac vice*)
8                                             rtingey@dreierllp.com
                                             499 Park Avenue
9                                             New York, NY 10022
                                             Phone: (212) 328-6100
10                                            Fax: (212) 328-6101

11                                            **ARBOGAST & BERNS LLP**
                                             Jeffrey K. Berns (SBN 131351)
12                                            jberns@law111.com
                                             David M. Arbogast (SBN 167571)
13                                            darbogast@law111.com
                                             19510 Ventura Boulevard, Suite 200
14                                            Tarzana, CA 91356
                                             Phone: (818) 961-2000
15                                            Fax: (818) 861-1775

16                                            **KIESEL BOUCHER LARSON LLP**
                                             Paul R. Kiesel (SBN 119854)
17                                            kiesel@kbla.com
                                             Patrick DeBlase (SBN 167138)
18                                            deblase@kbla.com
                                             Michael C. Eyerly (SBN 178693)
19                                            eyerly@kbla.com
                                             8648 Wilshire Blvd.
20                                            Beverly Hills, CA 90211
                                             Phone: (310) 854-4444
21                                            Fax: (310) 854-0812

22                                            *Attorneys for Plaintiff*

23

24

25

26

27

28

# EXHIBIT 1

MIN: 1000285-1000105949-6          Loan Number: 1000105949

# ADJUSTABLE RATE NOTE

**(12-Month Average Yield On Actively Traded U.S. Treasury Securities - Rate Caps)**

THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY. THIS NOTE ALLOWS MONTHLY RATE CHANGES AND ANNUAL PAYMENT CHANGES. THIS NOTE ALLOWS ME TO CAP MY PAYMENTS. THIS NOTE MAY REQUIRE UNPAID INTEREST TO BE ADDED TO LOAN PRINCIPAL AND REQUIRE ME TO PAY ADDITIONAL INTEREST ON THE UNPAID INTEREST (NEGATIVE AMORTIZATION).

MAY 19, 2006                 MORENO VALLEY          CALIFORNIA
[Date]                         [City]                 [State]

21445 SHAKESPEARE COURT, MORENO VALLEY, CALIFORNIA 92557
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $346,500.00 (this amount is called ("Principal"), plus interest, to the order of Lender. Lender is COMUNITY LENDING, INCORPORATED, A CALIFORNIA CORPORATION
I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 1.000 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 8(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the 1st day of each month beginning on JULY 2006. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on JUNE 1, 2046, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 610 JARVIS DRIVE, SUITE 200, MORGAN HILL, CALIFORNIA 95037

, or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 876.15 . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 and Section 5 of this Note.

## 4.  ADJUSTABLE INTEREST RATE

**(A) Interest Rate Change Dates**

The interest rate I will pay will change on the  1st  day of JULY,  2006                , and the adjustable interest rate I will pay may change on that day every month thereafter. The date on which my interest rate changes is called an "Interest Rate Change Date."

**(B) The Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 500/1000                 percentage points (    3.500  %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Rate Change Date.

**(D) Limits on Interest Rate Changes**

My interest rate will never be greater than          9.950  %. My interest rate will never be lower than 3.500  %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Interest Rate Change Date.

## 5.  PAYMENT CHANGES

**(A) Payment Change Dates**

My monthly payment may change as required by Section 5(B) below beginning on the  1st   day of JULY,  2007                , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 5(D) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount the Note Holder will accept for any monthly payment. If the Minimum Payment is not sufficient to cover the amount of the interest due, then any accrued but unpaid interest will be added to Principal and will accrue interest at the rate then in effect. This practice is known as negative amortization. I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 5(D) below.

**(B) Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."

Unless Section 5(D), 5(E), or 5(F) apply, the amount of my new monthly payment on a Payment Change Date will not exceed my prior monthly payment by more than 7.5%. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the

---

amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 5(D) or 5(E) below require me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment or to select an alternate payment amount as described in Section 5(F) below.

**(C) Additions to My Unpaid Principal**

Because my monthly payment amount changes less frequently than the interest rate, and because the monthly payment is subject to the 7.5% Payment Cap described in Section 5(B), my monthly payment could be less than or greater than the amount of interest owed each month. For each month that my monthly payment is less than the interest owed, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. Interest will accrue on the amount of this difference at the interest rate required by Section 2 or Section 4, above. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment to interest before Principal.

**(D) Limit on My Unpaid Principal; Increased Minimum Payment**

My unpaid Principal can never exceed the Maximum Limit equal to        115.000  % of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. If on any payment due date I would exceed the Maximum Limit by paying my Minimum Payment, my monthly payment will be adjusted to the Full Payment. My new monthly payment until the next Payment Change Date will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

This means that my monthly payment may change more frequently than annually. Payment changes required under this Section will not be limited by the 7.5% Payment Cap described in Section 5(B), above.

**(E) Required Full Payment**

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(F) Additional Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options (the "Payment Options"). I will be eligible to select one of the Payment Options if it results in a larger monthly payment than my regular Minimum Payment. I may be given the following Payment Options:

(i)   **Interest Only Payment:** Pay only the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)  **Fully Amortized Payment:** Pay the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii) **15 Year Amortized Payment:** Pay the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

**(G) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my Minimum Payment before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 6.  BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

MULTISTATE ADJUSTABLE RATE NOTE
MTA-TWELVE MONTH AVERAGE INDEX
BSR4004  10/06/05                        Page 3 of 6              DocMagic *eRorms* 800-649-1362
                                                                 www.docmagic.com

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 7.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 8.   BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   15      calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be   5.000  % of my overdue payment of principal and interest.  I will pay this late charge promptly but only once on each late payment.

### (B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount.  That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D)  No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees.

## 9.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 10.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.  Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things.  Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note.  The Note Holder may enforce its rights under this Note against each person individually or against all of us together.  This means that any one of us may be required to pay all of the amounts owed under this Note.

MULTISTATE ADJUSTABLE RATE NOTE
MTA-TWELVE MONTH AVERAGE INDEX
BSR4004 10/06/05                              Page 4 of 8                    DocMagic *eFormns* 800-649-1362
www.docmagic.com

## 11. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 12. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is mailed or delivered within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
MARJORIE   BROOKS          -Borrower                                           -Borrower


_____ (Seal)          _____ (Seal)
                        -Borrower                                           -Borrower


_____ (Seal)          _____ (Seal)
                        -Borrower                                           -Borrower


*[Sign Original Only]*

MULTISTATE ADJUSTABLE RATE NOTE
MTA-TWELVE MONTH AVERAGE INDEX
BSR4004  10/06/05                    Page 6 of 6                    DocMagic *CPurms* 800-649-1362
                                                                    *www.docmagic.com*

FEDER    TRUTH-IN-LENDING DISCLOSURE STAT.    .ENT
(THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Loan Number 1000105949                                               Date: MAY 19, 2006
Creditor: COMUNITY LENDING, INCORPORATED
Address: 610 JARVIS DRIVE, SUITE 200, MORGAN HILL, CALIFORNIA 95037

Borrower(s): MARJORIE  BROOKS

Address: 21445 SHAKESPEARE COURT, MORENO VALLEY, CALIFORNIA 92557

Lines containing an "x" are applicable:

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf | Total of Payments the amount you will have paid after you have made all payments as scheduled. | ☐ Total Sale Price The total cost of your purchase on credit including your down payment of $ |
|---|---|---|---|---|
| 8.406 % | $932,621.96 | $340,879.37 | $1,273,501.33 | $ |

PAYMENTS: Your payment schedule will be:

| Number of Payments | Amount of Payment ** | When Payments Are Due Monthly Beginning | Number of Payments | Amount of Payment ** | When Payments Are Due Monthly Beginning | Number of Payments | Amount of Payment ** | When Payments Are Due Monthly Beginning |
|---|---|---|---|---|---|---|---|---|
| 1 | 1,193.78 | 07/01/06 | | | | | | |
| 11 | 1,193.78 | 08/01/06 | | | | | | |
| 12 | 1,259.49 | 07/01/07 | | | | | | |
| 12 | 1,330.13 | 07/01/08 | | | | | | |
| 2 | 1,406.07 | 07/01/09 | | | | | | |
| 82 | 3,009.16 | 09/01/09 | | | | | | |
| 166 | 2,749.28 | 07/01/16 | | | | | | |
| 193 | 2,691.53 | 05/01/30 | | | | | | |
| 1 | 2,691.50 | 06/01/46 | | | | | | |

_____ DEMAND FEATURE: This obligation has a demand feature.

__X__ VARIABLE RATE FEATURE: Your loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

INSURANCE: The following insurance is required to obtain credit:
_____ Credit life insurance and credit disability  __X__ Property Insurance  _____ Flood Insurance  __X__ Mortgage Insurance
You may obtain property insurance from any insurer that is acceptable to the Lender.

SECURITY: You are giving a security interest in: 21445 SHAKESPEARE COURT, MORENO VALLEY, CALIFORNIA
_____ the goods or property being purchased  __X__ Real property you already own.  92557

FILING FEES: $100.00

LATE CHARGE: If payment is more than ___15___ days late, you will be charged ___5.000___ % of the payment.
                                                                              * or $5.00 (whichever is greater)

PREPAYMENT: If you pay off early, you
__X__ may      _____ will not   have to pay a penalty.
_____ may      __X__ will not   be entitled to a refund of part of the finance charge

ASSUMPTION: Someone buying your property
_____ may      __X__ may, subject to conditions   _____ may not   assume the remainder of your loan on the original terms

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.

__X__ "e" means an estimate      _____ all dates and numerical disclosures except the late payment disclosures are estimates.

Each of the undersigned acknowledge receipt of a complete copy of this disclosure.  The disclosure does not constitute a contract or a commitment to lend

| Applicant MARJORIE  BROOKS | Date | Applicant | Date |
|---|---|---|---|
| Applicant | Date | Applicant | Date |
| Applicant | Date | Applicant | Date |

* NOTE  Payments shown above, do not include reserve deposits for taxes, assessments, and property or flood insurance.

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | SACV 08-17-AG (CTx) | Date | July 2, 2008 |
|---|---|---|---|
| Title | PAULA KELLER v. ALLSTATE HOME LOANS, INC., ET AL. | | |

| Present: The Honorable | ANDREW J. GUILFORD |
|---|---|

| Lisa Bredahl | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:      Attorneys Present for Defendants:

Not Present          Not Present

**Proceedings:**    **[IN CHAMBERS] ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT**

On June 12, 2008, Plaintiff Paula Keller ("Plaintiff") filed her Motion for Leave to Amend Complaint ("Motion"). In the Motion, Plaintiff requested to amend her complaint by (1) substituting Shearson Financial Network, Inc. ("Shearson") as a successor-in-interest to Allstate Home Loans, Inc.; (2) adding a new defendant, Countrywide Home Loans, Inc. ("Countrywide"); and (3) amending her allegations. The Court has not yet issued a scheduling order. Thus, Plaintiff's Motion is only governed by Federal Rule of Civil Procedure Rule 15. Plaintiff argues that the Motion should be granted because amendment is warranted under the liberal amendment policy of Rule 15(a). (Motion 2:24-26.) No opposition has been filed. After considering Plaintiff's argument, the Court GRANTS the Motion.

The Court finds this Motion appropriate for decision without oral argument. Accordingly, the hearing on this matter scheduled for July 7, 2008, is VACATED.

## LEGAL STANDARD

Federal Rule of Civil Procedure 15(a) allows a party to amend its pleading "only by leave of court or by written consent of the adverse party," and provides that "leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Rule 15 is "applied liberally," and leave to amend is generally granted as a matter of course up to the point when a responsive pleading is filed. *See Johnson v. Mammoth Recreations*, 975 F.2d 604, 607 (9th Cir. 1992); *see also Ascon Properties v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989). After a responsive pleading has been filed, leave to amend should be granted "unless amendment of the complaint would cause the opposing party undue prejudice, is sought in bad faith, constitutes an exercise in futility, or creates undue delay." *Ascon Properties*, 866 F.2d at 1160 (quoting *DCD Programs,*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 08-17-AG (CTx) | Date | July 2, 2008 |
|---|---|---|---|
| Title | PAULA KELLER v. ALLSTATE HOME LOANS, INC., ET AL. | | |

*Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987)). "While a court should consider each of the . . . factors when conducting its analysis, the crucial factor is the resulting prejudice to the opposing party." *Howey v. Radio Corp. of Am.*, 481 F.2d 1187, 1190 (9th Cir. 1973).

## ANALYSIS

Since a responsive pleading has not yet been filed, this analysis can be brief. The Court agrees with Plaintiff that adding a new defendant in this early stage of the litigation does not pose undue prejudice to the opposing party. As no responsive pleading has been filed and no scheduling conference has taken place, there is adequate time for all parties to conduct the necessary discovery and to prepare for trial. Second, in this case "there is no evidence in the record which would indicate a wrongful motive," and thus "there is no cause to uphold the denial of leave to amend on the basis of bad faith." *See DCD Programs, Ltd. v. Leighton*, 833 F.2d at 187. Finally, the proposed amendment would not be futile, as Plaintiff has adequately alleged that Shearson, as the successor-in-interest, and Countrywide, as the current owner of Plaintiff's Option Adjustable Rate Mortgage, may be liable. For these reasons, and considering the liberal amendment policy of Rule 15(a), Plaintiff has shown that she is entitled to leave to amend her Complaint.

## DISPOSITION

The Court GRANTS Plaintiff's Motion for Leave to Amend Complaint.

                                               :     0

Initials of Preparer